AMERICAN UNIVERSITY et al. v.
PRENTISS et al.
Civ. No. 931.

United States District Court
District of Columbia.

June 29, 1953.

---

390

Edward F. Colladay, David C. Colladay and Calvin G. Dworshak, Washington, D. C., for plaintiff American University.

Paul B. Cromelin, Thomas M. Raysor, and John F. Doyle, Washington, D. C., for plaintiff Lucy Webb Hayes National Training School for Deaconesses and Missionaries.

Andrew T. Altmann, Washington, D. C., for plaintiff Equitable Life Ins. Co.

Vernon E. West, Corp. Counsel, Oliver Gasch and John Hampton Baumgartner, Jr., Asst. Corp. Counsel for District of Columbia, for defendants Brigadier General Louis W. Prentiss and others.

James C. Wilkes and Norman Glasgow, Washington, D. C., for intervenors.

HOLTZOFF, District Judge.

This is an action to set aside an order of the Zoning Commission of the District of Columbia, which re-zoned the campus of the American University, located in Washington, D. C., from a residential "A" area to a residential "A restricted" area. The effect of this reclassification was to preclude the building of a proposed hospital on the campus, which is to be maintained in conjunction with a School of Nursing. The action is brought by the American University; Lucy Webb Hayes National Training School for Deaconesses and Missionaries, a corporation conducting the Lucy Webb Hayes School of Nursing and Sibley Memorial Hospital; and Equitable Life Insurance Company, which holds a deed of trust on the land of the University. The defendants are the five members of the Zoning Commission of the District of Columbia. Certain property owners have intervened and have been aligned with the defendants. It is claimed by the plaintiffs that the order in question is unconstitutional and illegal.

Shortly before the turn of the century, a Bishop of the Methodist Church purchased a large tract of land comprising over seventy acres for the purpose of establishing thereon an institution of higher learning to be known as the American University. The property is located near the western end of Massachusetts Avenue, one of the principal through highways of the city of Washington, running diagonally from east to west. The site was at that time in an outlying section, and both the projected campus and the surrounding area were practically a wilderness. The campus has a frontage on Massachusetts Avenue of about fifteen hundred feet in length. It is bounded on the east by Nebraska Avenue, also an important through thoroughfare, to the extent of over eighteen hundred feet. The line on the west is about twenty-three hundred feet long. University Avenue, which is only partially cut through, forms a part of the western boundary. On the south the land adjoins what are now Glenwood Road and Rockwood Parkway. The American University was chartered by a special Act of Congress. The campus site was cleared and buildings for the use of the University were gradually erected. Various departments and schools were established from time to time. From small beginnings, the University has expanded and reached an important stature among higher educational institutions. By this time it has a large enrollment of students and a considerable number of buildings. Portions of the campus still remain vacant, however, some of them containing wooded areas.

In 1920 the zoning system was introduced in the District of Columbia, and a Zoning Commission, composed of five members, was created to administer the zoning statute. D.C.Code, Title 5, Sections 412 et seq. The Commission subdivided the city into districts of various types. The American University campus and the surrounding area were classified as "A" residential. The regulations provided that in such a district there could be erected not only private dwellings and apartment houses, but also such structures as hotels, hospitals, sanitariums, clinics, churches, clubs, and the like.

With the expansion of the city, beginning in the 1920's, the American University campus gradually became surrounded by homes. A small commercial district also grew up along Massachusetts Avenue, a short distance west of the campus. Immediately adjacent to the campus on the south side, two beautiful communities composed of single-family detached residences of an expensive kind, developed by degrees.

392

These two sections are known as Wesley Heights and Spring Valley. In building these houses, very little attempt was made to level the ground. The original contours of the rolling terrain were maintained and many of the old trees were preserved. Instead of being cut on a gridiron pattern as is true of most of the city the streets were laid out to follow the contour of the land, many of them being dead-end streets and forming a cul-de-sac. The result is that there is little vehicular traffic on most of the streets of this section, with the exception of a large amount of through movement on Nebraska Avenue and the streets feeding it. Portions of this district were from time to time re-zoned as "A restricted" area, which is a category permitting the erection of only single, detached homes, churches and schools, but excluding apartment houses and institutions.

 It is important to note that the owners of the residences in Wesley Heights and Spring Valley purchased their property long after the American University was established and commenced its operations as an institution of higher learning, and even some time after the University campus was given its original zoning. The owners must have assumed that the University would keep growing and expanding and would create additional schools and departments, and that new buildings would be constructed on the campus from time to time to carry on activities suitable to a great University. They are also charged with knowledge that a hospital may be built in a section classified as a residential "A" area.

The second plaintiff, Lucy Webb Hayes National Training School for Deaconesses and Missionaries, is also a corporation under the aegis of the Methodist Church. It operates and conducts Sibley Memorial Hospital and the Lucy Webb Hayes School of Nursing in conjunction with each other. At the present time Sibley Hospital, which is one of the large hospitals in the city of Washington, is housed in structures approximately fifty years old, and is located in a congested, deteriorated section. It badly needs new buildings as well as removal to a more desirable neighborhood, both from the standpoint of its patients and the interests of the young women who are studying to become nurses. In fact the enrollment of its student nurses has been falling off due to the undesirable location of the school.

Recently the American University, desiring to establish a School of Nursing on a collegiate level, entered into an arrangement with the Lucy Webb Hayes School of Nursing and Sibley Memorial Hospital, whereby the two institutions last mentioned would be moved to the American University campus and become an integral part of the University. A site at approximately the southeast corner of the campus, comprising 7.85 acres, was set aside by the University for that purpose and accepted by the authorities controlling the school and the hospital. The Congress has authorized certain grants in aid to be made for the construction of several hospitals in this city because of a lack of adequate, modern hospital facilities in the Nation's Capital. It was expected that one of the grants would be made for the construction of the new Sibley Memorial Hospital on the proposed site.

The new Sibley Hospital is to be located at the southern tip of the campus, immediately adjoining the residential districts known as Wesley Heights and Spring Valley, which have been described above. The new hospital would in fact be situated almost directly across the street from several of the homes, although there would be a considerable setback.

A number of property owners in that area emphatically objected to the proposed new hospital as a neighbor and filed a petition with the Zoning Commission to rezone the American University campus, in order to prevent the erection of such an institution. The Zoning Commission held a hearing, as required by statute. Unfortunately, the atmosphere of the proceeding was not conducive to calm deliberation. Several organized bus loads of angry property owners filled the hearing room, and frequently interrupted witnesses and counsel by booing and hissing, or applauding.

The objections advanced against the construction of the new hospital were that it would result in a serious invasion of priva-

ey, create traffic congestion, generate noises, and impair property values. Although possible impairment of property values seemed to be the main argument, very little actual evidence on the subject was produced. The testimony consisted chiefly of emotional outbursts on the part of individual home owners, to the general effect that they had been informed by real estate experts that if the hospital were erected, the value of their property would decrease anywhere from thirty-five to fifty per-cent. Naturally such assertions are not evidence. One real estate expert was called, who testified that in his opinion the aggregate value of the surrounding districts would go down by an amount of over $2,500,000 or $3,000,000. He did not explain how he arrived at that lump sum or on what he based his opinion.

It is well established that administrative agencies are not required to apply the rules of law governing admissibility of evidence. These rules are binding only on judicial tribunals. Nevertheless, the probative weight of evidence is the same, irrespective of where the evidence is introduced, and must be tested by the same standards whether it is tendered to a court or to an administrative body.

As a result of the hearing, the Zoning Commission, by a vote of three to two, issued an order changing the entire campus of the American University from residential "A" area to residential "A restricted" area. No findings were made. No statement of reasons was issued. The result of this shift in zoning was that a hospital may not be built on the American University campus. If the order stands, the proposed arrangement between the American University, Sibley Hospital, and the School of Nursing cannot be carried out. It must be emphatically noted that although the testimony given at the hearing before the Commission and at the trial of this case, was directed largely to the effects of the erection of a hospital on the proposed site immediately adjoining Wesley Heights and Spring Valley, nevertheless, the rezoning order made by the Commission covers the entire American University campus, over seventy acres in size. Much

of the campus is a considerable distance from these residential districts.

The evidence shows that schools of nursing and medical schools are natural constituent departments of many universities, and that modern educational methods require that schools of nursing and medical schools be connected with hospitals operated in conjunction with and auxiliary to them. In many instances, schools of nursing and medical schools with cooperating hospitals are located on the university campus, as is the case, for example with Georgetown University, which is also situated in the city of Washington. On the other hand, there are some universities whose medical and nursing schools with cooperating hospitals are located away from the campus. It follows, therefore, that the construction and operation of a school of nursing or a medical school together with a cooperating hospital, is a proper and a natural use of a university campus.

To move Sibley Hospital to the proposed location would also advance the welfare of its patients. They would find themselves in a pleasant, airy section of the city, in suburban-like surroundings, with a beautiful, peaceful outlook, overlooking numerous trees. They would not be disturbed by many of the city noises.

This brings us to a consideration of the legal principles that must govern the disposition of this case. Zoning is an exercise of a legislative power, and not of an executive or administrative authority. The Commission, acting by delegation from Congress, performs a legislative function. The applicable statute sets forth the principles on which the zoning should be made and the administrative body carries out the details. In this respect such authority is analogous to the rule-making power, frequently conferred on executive departments and administrative agencies, which is also a delegation of legislative authority.

It necessarily follows that an action to set aside a zoning order does not involve a trial *de novo* or an appeal on the merits. The court may not substitute itself for the Commission. The suit does not even contemplate a judicial review of

administrative action to determine whether there was a deviation from any statutory requirement or limitation and whether the findings of fact are sustained by substantial evidence. Parenthetically it may be remarked that there are no findings of fact to review. The only matter that the court may consider is whether the zoning order is unconstitutional, as constituting a taking of property without due process of law. In view of these circumstances, the review by the courts is not limited to the record made before the Commission, but evidence on the constitutional issue may be introduced, as is done, for example in rate cases. This course was pursued at the trial of this action.

■ The state, in the interests of society as a whole, may place reasonable restrictions on the use of private property by its owners. Consequently zoning is constitutional if it bears a rational relation to public safety, health, or morals, or the general welfare. Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303. The action of zoning authorities is not to be held invalid unless the court is convinced that it is clearly arbitrary and unreasonable, having no substantial relation to the public safety, health, or morals, or the general welfare. If such substantial and reasonable relation does not exist, limitations imposed by a zoning order constitute a taking of property without due process of law, either under the Fifth or the Fourteenth Amendment, whichever is applicable.

■ If the question is fairly debatable, the zoning order must stand, Leventhal v. District of Columbia, 69 App.D.C. 229, 230, 100 F.2d 94; Lewis v. District of Columbia, 89 U.S.App.D.C. 72, 74, 190 F.2d 25. Nevertheless, "The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and, other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare." Nectow v. City of Cambridge, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842. There have been a number of cases in this district in which a zoning order has been set aside as invalid. For example, in Wolpe v. Poretsky, 81 U.S.App.D.C. 67, 154 F.2d 330, the courts upset an order of the Commission zoning certain vacant property in such a way as to prevent its owner from building an apartment house thereon.

We must now apply these principles to the facts of the case at bar. It should be observed at this juncture that most zoning orders are made on the application of an owner who desires a change in the zoning of his property. In the instant case the situation is somewhat unusual. Here, the change was made at the behest of adjoining property owners. The right to erect a hospital on the campus of the American University existed ever since the site was acquired, and ever since 1920 when the original zoning was established. The objecting land owners came on the scene subsequently and may be said to have acquired their property *cum onere*, morally, if not legally. The University was deprived of its rights by the re-zoning order here under scrutiny. The University is not asking for an additional privilege which it did not previously have, as is so often the case in zoning proceedings, but is protesting against being deprived of a right which it had had for a great many years and on which it had acted and relied. Finally, although the testimony, as stated above, was directed largely to one eight-acre plot at the southerly tip of the campus, the re-zoning order covers the entire seventy acre tract.

In analyzing the evidence at the trial it must be assumed that portions of the campus now vacant will not permanently remain in that condition, but that additional buildings will be erected from time to time. For example, a dormitory or a garage for students or members of the faculty might be constructed on the site to which it is now proposed to move Sibley Hospital, if the re-zoning order stands. The projected hospital must not be envisaged as an old-fashioned, red brick edifice of institutional aspect and forbidding mien. The plans introduced in evidence call for a group of modern, light colored structures, with plenty of window space, built on a plot

artificially landscaped and terraced, and surrounded by a grove of trees partially obscuring the buildings from view.

One of the objections to the construction of the hospital is that it would introduce into a quiet residential region noises not now existing. It must be assumed, however, that a dormitory or a garage would likewise bring loud sounds in its wake. On the other hand, modern hospitals endeavor to establish "quiet zones" for the welfare of the patients.

It is also urged that there would be a dangerous increase of traffic to a point of saturation. The evidence tends to show that traffic on Nebraska Avenue is heavy during rush hours. At other times the traffic is comparatively light. Judging by the number of vehicles entering and leaving the Georgetown Hospital, which is of a comparable size, and which is also located in a residential area, the added traffic burden would amount to about six or seven percent. A part of this increase, however, would be created during periods other than rush hours. It is inconceivable that this additional amount of traffic cannot be absorbed without difficulty especially with proper use of police officers and the installation of control signals, if necessary or desirable. The construction of new buildings, which is continually going on in that area, as well as elsewhere, necessarily leads to some increase of traffic. Moreover, many of the objections on this score were based on a misunderstanding, as some of the property owners apparently thought that entrances to the hospital site would be cut through from University Avenue, which is now a very quiet and almost deserted thoroughfare, somewhat like a country road. It appears, however, that the hospital plans call only for an access road from Rockwood Parkway, near its junction with Nebraska Avenue, leaving University Avenue undisturbed. The University and hospital authorities are willing to enter into a covenant running with the land for the benefit of owners of adjacent property, not to cut any other entrance to the hospital tract for a period of twenty years. Moreover, it is proposed to create adequate parking spaces on the hospital grounds, in order that it may not be necessary for members of the staff, employees, and visitors to park their cars in any of the surrounding streets.

The chief objection, however, is that the proposed hospital would impair property values. Testimony to that effect was given by real estate experts, who even calculated the exact amount of impairment as reaching from thirty-five to fifty percent and computed it concretely in dollars and cents. Expert testimony as to values of real property is admissible, and frequently is entitled to considerable weight, especially if it is based on a consideration of actual sales of property in the vicinity. In this case, however, the testimony did not relate to present values, but constituted a prophesy of what the values would be in case a specified contingency occurred in the future. Each of the expert witnesses frankly admitted that his testimony was merely an opinion or a prognostication, and that he had no facts by which to substantiate it. Such alarming forecasts evolved from the inner consciousness of the witnesses are worthy of but scant consideration.

The only evidence as to real estate values based on actual facts was as follows. The uncontradicted testimony showed that when the Georgetown University Hospital was moved into a residential area several years ago, the values of adjoining and nearby residential property were not affected, in spite of the fact that a community situated diagonally across the street from the Hospital and known as Burlieth was composed of single family dwellings. The uncontroverted testimony further showed that when a hospital known as the Suburban Hospital was erected a few years ago in a nearby suburb in Maryland, composed of single family detached dwellings, property values were not decreased. No other factual evidence was introduced in respect to the effect on property values of the construction of any other hospital than those named, either in this city or elsewhere.

It is reasonable to assume that if there existed actual instances of impairment of residential property values as a result of

the construction of a hospital, evidence to that effect would have been adduced.

The only attempt to reconcile these facts with the dire predictions, was made by one of the real estate experts who testified that row houses, such as are found in Burlieth, are not diminished in value by the building of a hospital nearby, but that values of expensive detached homes would be adversely affected, because people who own residences of the latter type want more privacy. The argument, based on sheer speculation and pure conjecture, that the value of costly homes is more likely to decline as the result of the construction of a hospital in their vicinity than is the case with less expensive residences, is not an appealing one and does not seem to justify the action taken by the Commission or vindicate the constitutionality of its decision. It bears no reasonable relation to the public safety, health, morals, or the general welfare.

The court finds on the basis of the foregoing discussion that the zoning order involved in the case at bar bears no reasonable relation to the public safety, health, or morals, or the general welfare. It further finds that the order deprives the American University of the right to use its property in a manner possessed by it since the acquisition of the land and also uninterruptedly since 1920, when zoning was introduced in the District of Columbia. It further finds that in any event no sufficient basis has been shown for re-zoning the entire campus tract. The conclusion of law necessarily follows that the order of the Zoning Commission constitutes a taking of property of the American University without due process of law, in violation of the Fifth Amendment, and is hence unconstitutional and void. Judgment for the plaintiffs will be rendered accordingly.

In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., the summary of the facts and the law contained in this opinion will constitute the findings of fact and conclusions of law of the court. Counsel will submit a proposed judgment.